**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br><br>v.<br><br>THE FUNDS ASSOCIATED WITH THE BINANCE.COM ACCOUNT OPERATED BY USER 977889250,<br>*Defendant*.<br><br>[Claimant: Maksim Sultan] | No. 3:26-cv-____________<br><br><br><br><br><br><br>August 7, 2026 |

**VERIFIED COMPLAINT OF FORFEITURE**

Now comes Plaintiff, United States of America, by and through its attorneys, David X. Sullivan, United States Attorney for the District of Connecticut, and David C. Nelson, Assistant United States Attorney, and respectfully states that:

1. This is a civil *in rem* action brought to enforce the provisions of 18 U.S.C. § 1956.

2. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 & 1355. Venue is appropriate in the District of Connecticut by virtue of 28 U.S.C. § 1395(b).

3. The Defendant Asset are the funds held in the Binance.com Account operated by User ID 977889250 ("Defendant Asset"). The Defendant Asset is registered to one Максим Султан (anglicized Maksim Sultan or Maxim Sultan). The Defendant Asset is associated with cryptocurrency wallet address **TK1NR8**Mmg4CboKPxg6NrtH2GBPAHxwFYJ.

4. The Defendant Asset is located within the jurisdiction of this Court.

**Commission of Wire Fraud**

5. On Sunday, November 30, 2025, M.M., a resident of West Hartford, Connecticut, attempted to make a deposit of Bitcoin to his online account at Coinbase.com. When his repeated attempts failed, M.M. conducted a Google search for Coinbase customer support.

6. The search yielded a link to a fraudulent website purporting to be a legitimate customer service page of Coinbase. This website listed Coinbase's customer service phone number as 818-940-1286.

7. Believing the website and telephone number to be legitimate, M.M. called the number and was answered by a man who gave his name as Brian Meyers[1] and represented to be a customer service agent of Coinbase.

8. Meyers requested M.M.'s email address to verify his identity, which M.M. provided. Thereafter, Meyers demonstrated apparent knowledge of M.M., including his name, which lent credibility to the fraudulent representation.

9. M.M. explained to Meyers that he was unable to deposit new funds into his account. Meyers responded that M.M.'s Coinbase account had been locked due to a "hacking attempt" originating from Austin, Texas, and the reason M.M. wasn't alerted of the imminent threat was a technical error with Coinbase's email delivery system. Meyers explained that due to this hacking attempt, M.M.'s account was compromised and that it was necessary to "secure the coins into a new wallet" to protect M.M.'s assets.

10. Meyers directed M.M. to download two mobile phone applications: the Coinbase mobile app and an app called "AnyDesk."

[1] The individual who identified himself as Brian Meyers is unknown. However, for the purposes of this complaint, that individual will be continually referred to as Meyers.

11. AnyDesk is downloadable software that allows users to remotely access one of their devices from another (*e.g.*: accessing your desktop computer from your smartphone). AnyDesk works by generating a unique nine-digit code for each device to which it is installed. Only with this nine-digit code can a user gain access to said device.

12. At Meyer's direction, M.M. provided the man he believed to be the customer service agent with the nine-digit access code for his mobile phone, allowing the fraudster to see M.M.'s smartphone screen in real time. This access allowed Meyer's to successfully walk M.M. through the following steps:

    a. complete a "security check" which entailed sending the fraudster (1) photographs of his driver's license and (2) a video of himself moving his head from side to side;

    b. transfer the entirety of M.M.'s Bitcoin (BTC) holdings, totaling $48,496.65 (at that time), to wallet address **<u>bc1qq3</u>**uva7ss03yltj66dve3jnyl8g3vwqqewx8k36; and

    c. transfer the entirety of M.M.'s Ethereum (ETH) holdings, totaling $6,351.98 (at that time), to wallet address **<u>0x7Efc</u>**20fD685268855bDcf298fDd6e7Ede7aA34e4.

13. Meyers had claimed these two accounts were secure holding accounts safe from the phony hacking attempt.

14. In reality, they were digital wallets unaffiliated with Coinbase to which the fraudster(s) had access. The representations made to M.M. were false and designed to defraud him of his money.

15. Once the individual masquerading as Meyers had possession of the funds, he informed M.M. that a new Coinbase account would be opened and M.M.'s cryptocurrencies would be transferred to this new account. Meyers told M.M. he would call back in "several minutes" when this process was complete.

16. The phone call never came. M.M. attempted to call 818-940-1286 again in an effort to be reconnected with Meyers but the number had been taken out of service. At this point, M.M. realized he had likely been the victim of a scam and contacted authorities.

**Blockchain Analysis and Cryptocurrency Tracing**

17. As stated above, M.M. was fraudulently induced into making two transfers on November 30, 2025; one of his Bitcoin holdings and the other of his Ethereum holdings.

18. Officials conducted a Blockchain trace of these transfers and transactions that would follow.

19. At the direction of Meyers, M.M. transferred 0.53043064 BTC to wallet address **bc1qq3** at approximately 1845 UTC.

20. Thirty-seven minutes later, around approximately 1925 UTC, M.M. was induced to do the same with his Ethereum holdings, transferring 2.09311214 ETH to wallet address **0x7Efc**.

21. At this address, M.M.'s funds commingled with Ethereum from an unrelated source, bringing the total balance of the wallet to approximately 4.80 ETH.

22. One day later, on December 1, 2025, at approximately 0145 UTC, the operator of these accounts transferred both the BTC and ETH out of their respective wallets to different accounts hosted at Bridgers.xyz.[2] Here, both cryptocurrencies were exchanged for USDT

[2] Bridgers is a bridge service that allows users to exchange various cryptocurrencies.

(Tether).[3] The Bitcoin yielded 45,820.65 USDT and the Ethereum 13,660.69 USDT, totaling 59,481.34 USDT in the Bridgers accounts.

23. This Tether was then transferred in its entirety from the Bridgers account to wallet address **TN8iA**chZ2BA3tCT87TatYiErARfqqyAWkE. This account had previously held 842.90 USDT of unknown origin, raising the total balance of the account to 60,324.24 USDT.

24. Minutes later, at 0204 UTC, all 60,324.24 USDT was transferred out of that wallet address to new wallet address **TJsypa**N2Lixu6HmYck9QGmJFSEqDHQUiNm. From here, the funds were split into two distinct transaction paths.

25. The first involved a transfer of 41,000 USDT to one or more destination wallets. The second path comprised 7,300 USDT.

26. The 7,300 USDT referenced above was then transferred to wallet address **TAvdnL**ziR9MpJ1QZc8MVQEotzagD2iXjkw on December 11, 2025, at 1233 UTC.

27. Just sixteen minutes later, at 1250 UTC, that same balance was transferred to wallet address **TK1NR8**Mmg4CboKPxg6NrtH2GBPAHxwFYJ—the Defendant Asset.

28. Significantly, less than twenty minutes later, at 1309 UTC, that same 7,300 USDT was *transferred back* to wallet address **TAvdnL**.

29. The circular nature of this transaction–which included funds traceable to the initial wire fraud of M.M. and had no discernable economic purpose–demonstrated that the Defendant Asset (the Binance account associated with wallet **TK1NR8**) was involved in Money Laundering in violation of 18 U.S.C. § 1956.

[3] Tether is a kind of cryptocurrency called stablecoin—its value is pegged 1:1 to the U.S. Dollar (USD). Therefore, when a figure is given in USDT, it can be assumed its value in USD is equivalent.

**Analysis of Defendant Asset Account Records**

30. The Defendant Asset was identified by authorities as a deposit address at Binance.com, a Seychelles-registered cryptocurrency exchange that operates globally as a Virtual Asset Service Provider (VASP) where users can buy, sell, exchange, and store cryptocurrencies.

31. Analysis of the account records associated with this Binance address showed it was owned and operated by User ID 977889250, corresponding to Максим Султан. This is the account associated with wallet address **TK1NR8**.

32. The Access Logs associated with the account revealed the wallet was regularly and exclusively accessed from an IP address geolocated to Ukraine, specifically the cities of Odesa and Kyiv.

33. In addition to the deposit and immediate withdrawal of M.M.'s funds into and out of the Defendant Asset, further analysis of the account's withdrawal history demonstrated a systemic patter of cryptocurrency movement consistent with money laundering using a "pass through" or "layering" scheme, detailed below.

34. The account received six deposits between December 1 and December 11, 2025, all in the form of USDT, totaling 208,776 USDT:[4]

i. 1 USDT on December 1;

ii. 10 USDT on December 5;

iii. 126,463 USDT on December 5;

iv. 21,429 USDT on December 5;

v. 53,573 USDT on December 9;

[4] Prior to December 1, 2025, the only transaction involving the account was an airdrop of 6,000 USDC (USD Coin, another stablecoin) with the attached title "Together Initiative." Airdrops are unsolicited distributions of cryptocurrency, usually employed as a means of generating exposure and attention to a new cryptocurrency.

vi. 7,300 USDT on December 11, the subject of the tracing analysis described above.

35. Excluding the tester transaction on December 1, five deposits were made into the Defendant Asset between December 5 and December 11. Over this same period, the account operator executed six withdrawals totaling 172,900 USDT:

i. 6,600 USDT on December 5 withdrawn to wallet address **TTcj9D**1dkLNrAQMpPqg6xcxDV5Nk5ASMZh;

ii. 70,000 USDT on December 5 also withdrawn to wallet address **TTcj9D**1dkLNrAQMpPqg6xcxDV5Nk5ASMZh;

iii. 70,000 USDT on December 8 withdrawn to wallet address **TE45nj**eFwYNvUh8BwDA3UAdXsJjt5P115S;

iv. 9,000 USDT on December 10 withdrawn to wallet address **TT8SYN**aSNJWzAE81Q49qzxn4pEHLT58enZ;

v. 10,000 USDT on December 11 also withdrawn to wallet address **TT8SYN**aSNJWzAE81Q49qzxn4pEHLT58enZ;

vi. 7,300 USDT on December 11 withdrawn to wallet address **TAvdnL**ziR9MpJ1QZc8MVQEotzagD2iXjkw, the same wallet address from which it came, as described above.

36. Additionally, over this same period, account history revealed four failed withdrawal attempts from the Defendant Asset in the amounts of 70,001; 6,601; 70,001; and 9,001 USDT. Considering the high volume and frequency with which funds were transferred into and out of the account, these withdrawal attempts likely failed due to automated fraud detection systems or other temporary exchange-imposed limits.

37. Moreover, the Subject Property was opened on or about August 2024. Yet, the first deposit into the account was not made until December 1, 2025 (omitting the transaction described in Footnote 4).

38. Use of the account in the ways detailed in this section is inconsistent with lawful uses of cryptocurrency accounts, such as trading or wealth building. Instead, the transactional patterns exhibited by the Defendant Asset are hallmarks of "pass-through" or "layering" schemes designed to obfuscate the true origins of the funds. Further, the Defendant Asset contained, in part, funds traced to the initial wire fraud of M.M.'s Coinbase account.

39. The Defendant Asset also had minimal holding periods. The time elapsed between deposits and withdrawals was consistently brief, ranging from hours to at most several days. The December 11, 2025, transaction involving the Victim's traced funds represents the most extreme example of this pattern, with the 7,300 USDT held in the account for less than twenty minutes before being withdrawn. This minimal holding period is inconsistent with legitimate cryptocurrency trading, investment, or personal use, and is instead characteristic of a deliberate effort to obscure the source and ownership of the funds through rapid movement across multiple wallets and exchanges.

40. Therefore, the Defendant Asset is subject to forfeiture for being involved in violations 18 U.S.C. § 1956 by laundering the proceeds of wire fraud (18 U.S.C. § 1343).

Wherefore, the United States of America prays that a Warrant of Arrest In Rem be issued for Defendant Assets in United States Currency; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the property to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

The United States requests a trial by jury.

DAVID X. SULLIVAN,
UNITED STATES ATTORNEY

By: /S/ David C. Nelson
David C. Nelson (ct25640)
Assistant U.S. Attorney
Dylan A. Giordano
Legal Intern
157 Church St. 24th Floor
New Haven, Connecticut 06510
Tel: (203) 821-3700
Fax: (203) 773-5373
David.C.Nelson@usdoj.gov

**DECLARATION**

I am a Special Agent with the United States Secret Service, and the individual assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint of Forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of August, 2026.

/s/ Brandon Hall
BRANDON HALL
SPECIAL AGENT, USSS